UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
UNITED STATES OF AMERICA,

        Plaintiff,

  -against-

IRENE SANTIAGO,

        Defendant.
------------------------------------------------x

MEMORANDUM AND ORDER
05 CR 590 (ILG)

GLASSER, United States District Judge:

      Pending before this Court is Ms. Santiago's petition for a writ of *error coram nobis*. An appreciation of the history, albeit an abridged one, which led to the filing of this petition, is a necessary prerequisite to an informed disposition of it.

      In 2004, an investigation was commenced by the United States Attorney's Office for the Eastern District of New York together with the United States Postal Service of a security fraud scheme involving stock brokers at Merrill Lynch in New York and Lehman Brothers in Florida. In essence, the scheme involved brokers who placed phone receivers upon what are known as "squawk boxes" which transmitted internal communications to third parties, day traders, who then used those communications to their trading and financial advantage by what is known as "front running." Two of those brokers were employed by Merrill Lynch. They are Timothy O'Connell and Kenneth Mahaffy. Irene Santiago was also employed by Merrill Lynch. During the time this investigation was underway, she worked as a client assistant for Mahaffy and O'Connell, but primarily for O'Connell. Her duties included answering the telephones and performing various administrative functions for him.

In the course of the investigation, the government sought to interview Ms. Santiago with a view of learning the details of how the internal information was disseminated throughout the offices of Merrill Lynch, and was then transmitted to the outside broker day-traders. The fact of the investigation and the request to interview Ms. Santiago became known to O'Connell and to Ben Grimaldi, who was the Chief Compliance Officer at the branch office of Merrill Lynch where Ms. Santiago worked. It is fair to say that having learned of Ms. Santiago's pending interview, O'Connell and Grimaldi, whether separately or together, embarked on an effort to induce her to lie to the investigating federal agents and to the Grand Jury. They succeeded. O'Connell was convicted of Count 35 of an indictment which charged him with witness tampering; namely, knowingly, intentionally and corruptly persuading and misleading Ms. Santiago with the intent to influence and prevent her testimony in a Grand Jury investigation and to cause and induce her to withhold testimony from the Grand Jury and to prevent her from communicating information of securities fraud to federal agents. Ben Grimaldi pleaded guilty to conspiring to commit witness tampering in precisely the same words in which O'Connell was charged.

Ms. Santiago pleaded guilty on August 5, 2005 to conspiring with O'Connell to obstruction of justice by testifying falsely before the Grand Jury. Reading the stark phrase "pleaded guilty to . . . . " masks what lies behind it—O'Connell and Grimaldi, her supervisors, corruptly persuading her and inducing her to lie, to which she succumbed. Six days later, on August 11, 2005, Mahaffy, O'Connell, Ghysels and one other, the brokers, were indicted on 40 counts of securities fraud, Travel Act violation, false statements and witness tampering. Superseding indictments thereafter added four co-defendant third party day-traders. 05 CR 613, Dkt. Nos. 47 and 63. The trial proceeded

on one count of conspiracy to commit securities fraud, twenty counts of substantive securities fraud, one count of Travel Act violations, several counts of witness tampering, conspiring to commit witness tampering and making false statements. The trial, at which I presided, continued for seven weeks. The jury deliberated for one week. They acquitted all the defendants of the securities fraud and Travel Act counts, convicted O'Connell of witness tampering and making a false statement and were unable to reach a verdict on Count One, conspiracy to commit securities fraud, to which I declared a mistrial.

A retrial of all the defendants was held before Judge Gleeson on the one remaining count of conspiracy to commit securities fraud. The trial lasted for approximately three weeks. The government's case proceeded on two theories in both trials. The government claimed that the information made available via the squawk box to the third party day-traders was confidential, the property of the brokerage houses of which they were deprived and deprived also of the honest services of their employees by their disclosure. The linchpin of each theory was the confidentiality of the information and the burden of the government's presentation was addressed to that issue. The jury returned a verdict of guilty after deliberating for two days.

Not long after the defendants were sentenced, they became aware of thirty transcripts of depositions taken by the SEC, which was collaborating with the United States Attorney's Office in the investigation leading up to the prosecution of this case. Those transcripts contained information which the government was obligated to make known to the defendants pursuant to Brady v. Maryland, 373 U.S. 83 (1963), because it was material to guilt and its exculpatory value was obvious. It was information that contradicted the testimony of key government witnesses as to the confidentiality of the

3

information at issue.  The deposition testimony of a significant Merrill Lynch employee was that the information was not confidential at all and that there was nothing wrong with the transmission of that information by the brokers.  See United States v. Mahaffy, 693 F.3d 113, 128–30 (2d Cir. 2012).  What is disturbing is that those transcripts were made known to the Assistant United States Attorneys prosecuting this case prior to the first trial but never disclosed to the defendants.  Those transcripts were also known to the Assistant United States Attorneys prosecuting the second trial but were never disclosed by them either.  693 F.3d at 122–23.  The motions for a new trial which inevitably followed were granted and the defendants' convictions were ultimately vacated.  More significant, however, is the agreement the government entered into with O'Connell to defer prosecuting him on a Fifth Superseding Indictment for a period of six months.  Noting his successful completion of the deferral period, the government obtained an Order dismissing that Superseding Indictment.  Dkt. No. 977.  A similar Order dismissing that Superseding Indictment was obtained as to Ghysels who had also successfully completed a term of a deferred prosecution agreement.  Dkt. No. 979.  A deferred prosecution agreement has also been entered into with Mahaffy, the terms of which are not known to the Court.  There being no request by the government as of yet to dismiss the superseding indictment, it is assumed that his deferral period has not as yet been completed.

      Thus, O'Connell who was found guilty of the securities fraud about which he knowingly and intentionally corruptly persuaded Santiago to lie and withhold testimony from the Grand Jury, has his securities fraud conviction vacated and freed of the specter of being charged with that crime anew.  The record of Mahaffy, the other principle defendant, will also similarly be sanitized.

I have provided a broad overview of the historical background believed to be necessary for an informed and just disposition of this motion. More important in my view, to a just disposition of this motion is a feel of the texture of the manipulation of Ms. Santiago which only a reading of portions of the record can provide.

The portions of the record to which reference is made are transcripts of conversations intercepted during the investigations between Ms. Santiago and O'Connell which are attached to the Government's letter of September 15, 2010, Dkt. No. 27; Ms. Santiago's plea allocution, Dkt. No. 8; and the transcript of the testimony in both trials. The transcripts of the intercepted conversations are replete with O'Connell trying to assure her that she did nothing wrong; that she didn't lie; that she knew nothing about what he was doing; and that the government was frightening her and making her believe things that she didn't do. In the attachment marked GX 908T, Ms. Santiago is reportedly heard to say "I just want to tell the truth," at 1; "I'm just gonna tell the truth Tim. I have to," at 3; "I'm just gonna tell the truth," at 4; "I gotta be honest," at 6. More telling, was his appeal to her sympathy and instilling in her a sense of guilt if she told the truth. For example:

> O'Connell: My whole life is gonna change. I'm gonna go away and I'm gonna lose my family.
>
> Santiago: Oh my God, Tim stop. Please.
>
>  . . . .
>
> O'Connell: I lose everything. The kids, and the family, and the house.
>
> Santiago: Tim why do you do this to me? Why did you put this on me like this?
>
> GX 908T at 3–4.

> O'Connell: I'm gonna, I'm gonna. I'm gonna do something stupid . . . . I can't live with myself like this.
>
> . . . .
>
> Santiago: Don't do that, don't do that to me. That's not right.
>
> GX 908T at 7–8.

The impact upon her of those dramatized consequences, for which she would be responsible if she told the truth, is palpable.

The transcript of her guilty plea allocution describes how she was instructed by the brokers and the administrative manager in her office to lie and although she knew it was wrong not to be truthful with the Government, she obeyed the instructions she was given. Tr. 08/5/05 at 29–30. Her testimony at both trials was consistent in that regard throughout.

In anticipation of her sentence, the Government by letter dated September 15, 2010, to which reference has already been made, moved pursuant to § 5K1.1 of the United States Sentencing Guidelines to permit the Court to depart from the advisory guidelines range. The Court is informed in that letter of her extensive cooperation that was "extremely valuable in its investigation and prosecution of this complex case." It acknowledged that it was her cooperation that led Grimaldi, the Chief Legal Officer at Merrill Lynch, to plead guilty and ended the active obstruction for which Grimaldi and O'Connell were responsible. Set out in that letter were excerpts of recorded telephone conversations she placed with O'Connell which supplement those that have been set out above. In that letter, the Government recognizes, at 2, that the recordings received in evidence plainly demonstrate that Ms. Santiago was pressured to lie by O'Connell and Grimaldi. At page 3 of that letter the Government writes that the recordings plainly

demonstrated how O'Connell "manipulated Santiago and pressured her to lie," setting out portions of their conversation.

Ms. Santiago's cooperation continued for nearly five years. She met with the Government more than 20 times, frequently coming to Government's offices from Pennsylvania. She testified at the second trial while pregnant. Remarkable, however, is the concluding paragraph of the Government's letter which states, at 5: "It is also worthwhile to note that Santiago obstructed justice, not to cover up another crime, but out of a misguided sense of loyalty to Mahaffy and O'Connell," as it recognized, under sustained pressure.

The last portion of the record of the first trial of this case which is a fitting coda to this unfortunate, misguided saga, is my statement when I sentenced Ms. Santiago. I said:

> I presided over the first Mahaffy trial, remember Ms. Santiago's testimony quite clearly. I suppose a reasonable man might wonder why Ms. Santiago was indicted at all. If the Government, as aware of what they acknowledge in the 5K1.1 letter, that her statements which were untruthful were a result of an amount of pressure that was being placed on her, not only by Mr. O'Connell, but by the person who was the Chief Compliance Officer at Merrill Lynch, I suppose reasonable men might wonder why Ms. Santiago was . . . prosecuted, why she was indicted at all.

Tr. of 9/27/10 at 5.

## Discussion

The writ of coram nobis was an ancient common law remedy generally stated to have been created to "correct errors of fact." United States v. Morgan, 346 U.S. 502, 507 (1954); Nicks v. United States, 955 F.2d 161, 166–67 (2d Cir. 1992). There is no Congressional enactment specifically authorizing the issuance of that writ. The power

7

residing in the court to grant it is recognized to be derived from the "All Writs Act," 28 U.S.C. § 1651, which provides in relevant part that: " . . . All courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." That statute "originated in the Judiciary Act of 1789 and its substance persisted through the Revised Statutes and the Judicial Code to its present form upholding the judicial power to <u>attain justice</u> for suitors through procedural forms agreeable to usages and principles of law." <u>Morgan</u>, *supra*, at 506–07 (emphasis added) (quotations and citations omitted). The common law limitation upon the issuance of the writ to "correct errors of fact" is not imposed by the statute.

"In American jurisprudence, the precise contours of coram nobis have not been well defined." <u>United States v. Denedo</u>, 556 U.S. 904, 910 (2009). That observation is made manifest by the All Writs Act which is the progenitor of the writ and authorizes its issuance when "necessary or appropriate," terms which the "attainment of justice" would best embrace and which precedent would support.

The case frequently cited as prescribing the prerequisites to be satisfied by the petitioner seeking the writ is <u>Foont v. United States</u>, 93 F.3d 76, 79 (2d Cir. 1996), which, the Court wrote, were that "1) there are circumstances compelling such action to achieve justice; 2) sound reasons exist for failure to seek appropriate earlier relief; and 3) the petitioner continues to suffer legal consequences from her conviction that may be remedied by granting the writ." (citations and quotations omitted).

    A.    <u>Circumstances Compelling the Writ to Achieve Justice</u>

At the outset, demonstrating that it is the achievement of justice that is the touchstone of the writ are, for example, <u>Morgan</u>, *supra*, at 507–08, in which the Court

wrote that the writ of coram nobis was available at common law to correct errors of fact, it was "by no means so limited." "Continuation of litigation after final judgment and exhaustion or waiver of any statutory right of review should be allowed through this extraordinary remedy only under circumstances compelling such action to <u>achieve justice</u>." (emphasis added.) <u>Id.</u> at 511. In <u>United States v. Denedo</u>, *supra*, at 911, the Court wrote, "To confine the use of <u>coram</u> <u>nobis</u> so that finality is not at risk in a great number of cases, we were careful in <u>Morgan</u> to limit the availability of the writ to 'extraordinary' cases presenting circumstances compelling its use to '<u>achieve justice</u>.'" (emphasis added) (quoting <u>Morgan</u>, 346 U.S. at 511). Those circumstances are present here. As has been clearly evidenced by the government's forthright recognition of the reality of what transpired, "O'Connell manipulated Santiago and pressured her to lie . . . it is also worthwhile to note that Santiago obstructed justice, not to cover up another crime that she committed, but out of a misguided sense of loyalty to Mahaffy and O'Connell." Government's Sentencing Memorandum, Dkt. No. 27, at 3 & 5. The subtle pressure to which she succumbed before the Grand Jury was as "telling as coarse and vulgar ones." <u>Garrity v. New Jersey</u>, 385 U.S. 493, 496 (1967). She remains a convicted felon while O'Connell, Mahaffy and their co-conspirator defendants who were the principal targets of the government's investigation, who benefited handsomely from the use to which they put the squawk boxes, are now conviction free—free to vote, to serve on a jury, to honestly say that they are not felons in making application for employment. An observation by Reginald Heber Smith is called to mind as exquisitely applicable to what has been above portrayed: "Nothing rankles more in the human heart than a brooding sense of injustice. Illness we can put up with, but injustice makes us want to pull things down." Smith, <u>Introduction</u> to EMERY A. BROWNELL, LEGAL AID IN THE

9

UNITED STATES, at xiii (1951).  I am driven to the conclusion that to remedy the perpetuation of this injustice, the issuance of this writ is both necessary and appropriate to attain the justice which its progenitor, the All Writs Act authorizes and precedent would support.

The government opposes Ms. Santiago's request for relief on three grounds.  First, it argues there was no fundamental error rendering past proceedings irregular and invalid.  It need not be noted here that "irregular and invalid" hardly describe the consequence of the government's Brady violation.  Ms. Santiago does not assert that there were errors in past proceedings.  She doesn't deny that she lied before the grand jury which warranted the return of an indictment.  In its Memorandum of Law in Opposition to her Petition, the government devotes six pages to asserting that Ms. Santiago lied and that the grand Jury correctly discharged its obligation.  It cites the cases which repeat the traditional view of coram nobis as available where there have been fundamental errors rendering proceedings irregular and invalid, <u>Fleming v. United States</u>, 146 F.3d 88 (2d Cir. 1998), and <u>Foont</u>, 93 F.3d 76, for example.  Noticeably avoided in its Memorandum is a refutation of the petitioner's plea that she has demonstrated that there are "circumstances compelling such action to achieve justice."  Absent from its opposition is a recognition, an acknowledgment, that the "precise contours of coram nobis have not been well defined" in American jurisprudence, <u>Denedo</u>, 556 U.S. at 910, and that the ancient writ is properly enlisted in the pursuit of justice "agreeable to usages and principles of law," <u>Morgan</u>, 346 U.S. at 506–07.

On April 1, 1940, then Attorney General Robert H. Jackson delivered an address titled "The Federal Prosecutor" to the United States Attorneys assembled at their Second Annual Conference in Washington, D.C.  He concluded his inspiring speech as follows:

> The qualities of a good prosecutor are . . . elusive and . . . impossible to define . . . . A sensitiveness to fair play and sportsmanship is perhaps the best protection against the abuse of power, and the citizen's safety lies in the prosecutor who tempers zeal with human kindness, who seeks truth and not victims, who serves the law and not factional purposes, and who approaches his task with humanity.

That address was called to mind as I read the Government's Memorandum of Law in Opposition to This Petition for Writ of Coram Nobis. Gov't's Mem.

Throughout that Memorandum, Ms. Santiago is described as having "lied," was "lying," maintained her "lies." Gov't's Mem. at 3, 7, 8, 9, 18. Not once in that Memorandum is there a reference to an acknowledgment of the pressure to lie to which she was subjected and the extent to which she was manipulated by O'Connell and Grimaldi, the Chief Legal Officer of Merrill Lynch. That the government was fully cognizant of her victimization is made manifest by having charged them with intentionally and corruptly persuading and causing her to lie to and withhold information from the Grand Jury and a United States Postal Inspector.

The government's assertion of Ms. Santiago's false statements as having "impeded the investigation of the front-running scheme and, as a result, the government struggled for months trying to uncover how the squawks were transmitted outside Merrill Lynch," Gov't's Mem. at 18, is at odds with the reality of the effect her false statements had on the investigation. It was the opinion of the investigating federal agent who interviewed her that her statement "initially impeded his investigation, but it did not result in a substantial interference with the administration of justice." Presentence Report at 5.

Of considerably more significance is the government's selective version of the opinion of the Court of Appeals which vacated the conviction of the defendants of

11

conspiracy to commit securities fraud. It reported it as follows: ". . . the Second Circuit found the squawk box defendants' criminal convictions . . . were legally sound; the convictions were vacated on the grounds of a <u>Brady</u> violation that, the Second Circuit believed, could have affected a factual determination by the jury . . . . Indeed, the Second Circuit expressly found that there was sufficient evidence at trial to sustain the conviction of the squawk box defendants." <u>Mahaffy</u>, 693 F.3d at 125–26. <u>"Thus the petitioner's lies to the grand jury served to conceal criminal activity</u>." Gov't's Mem. at 16 (emphasis mine).

Bearing in mind that at the heart of this case was "The government's theory . . . that the Broker defendants defrauded their employers of confidential information . . . ." and that "The viability of that theory depended on among other things, the government proving beyond a reasonable doubt that the squawked information was confidential," <u>Mahaffy</u>, 693 F.3d at 120, the government's stated version of the Court of Appeals decision is disingenuous as the following brief excerpts from that Court's Opinion make unmistakably clear:

> The withheld SEC testimony strongly suggests that the brokerage firms did not treat squawked block order information as confidential and that senior employees and management at the respective firms did not bar the transmission of squawks or take steps to maintain exclusive control of pending block order information.
>
> We have little confidence that the result would have been the same had the government complied with its <u>Brady</u> obligations and disclosed the SEC transcripts.
>
> \* \* \*
>
> The government's failures to comply with <u>Brady</u> were entirely preventable
> 693 F.3d at 133.
>
> \* \* \*

12

And finally, quoting from <u>United States v. Triumph Capital Group</u>, 544 F.3d 149, 164 (2d Cir. 2008):

> Where, as here, "The government suppressed evidence in its possession which was both exculpatory and impeaching, . . . there is a reasonable probability that if the evidence had been disclosed, the outcome of the proceeding would have been different."

693 F.3d at 134.

The Court, at 133 n.12, also made reference to the district court's view of the government's failure to discharge its constitutional obligation which was: "I remain mystified by the government's failure to disclose the testimony of the various witnesses . . . especially when the testimony was taken as part of the investigation of this very case." <u>United States v. Mahaffy</u>, No. 05-CR-613, 2010 WL 2925952, at *6 (E.D.N.Y. July 21, 2010). The government's claim that its investigation was impeded for months by Ms. Santiago's false statements pales in significance in the light of its withholding <u>Brady</u> material. In that regard, the Court of Appeals noted that: "The government's <u>Brady</u> violations have negatively impacted this case in two distinct but related ways. First, the two trials were unfairly skewed against the defendants, who were forced to mount their defenses without the benefit of material exculpatory and impeaching sworn testimony. Second, the costs of this litigation—in terms of personal, financial and judicial resources and time—have ballooned as a result of the two trials, post-verdict litigation, and two appeals to this Court." 693 F.3d at 133.

In the revealing light of all that has transpired since I sentenced Ms. Santiago on September 27, 2010, I am moved to repeat more emphatically now, "I wonder . . . why Ms. Santiago was . . . prosecuted, why she was indicted at all."

I am driven to refer to footnote 4, at 13, of the Government's Memorandum: "Although the government agrees that the petitioner's circumstances are sympathetic . . . the government continues to believe that, while the petitioner provided great value as a cooperator and is highly unlikely to become a recidivist, her deception before the grand jury merited prosecution. Moreover, this decision by the government to exercise its discretion and charge the petitioner with a felony was arrived at after a thorough evaluation of the petitioner's conduct." The merits of its decision to prosecute Ms. Santiago aside, it follows that notwithstanding all that has transpired since, the revelation that the government, violated its constitutional obligation to provide <u>Brady</u> material in its possession; the convictions of those who were the real targets of its investigation vacated; the superseding indictments against them dismissed and deferred prosecution agreements entered into; the government's opposition to Ms. Santiago's petition suggests a determination to embody Irene Santiago as the real life Hester Prynne, condemned to wear her scarlet letter of conviction for life. Based upon all that has been written above, I find the first of the coram nobis prerequisites satisfied, namely the circumstances surrounding this case are compelling and the issuance of this historic writ is necessary and appropriate in the attainment of justice.

B.  <u>Sound Reasons for Failure to Seek Appropriate Earlier Relief</u>

The second prerequisite, namely a sound reason for not seeking relief earlier, is easily satisfied. The government urges the rejection of her petition because she "cannot satisfy her burden of demonstrating sound reasons for her failure to seek relief." The basis for its opposition is stated to be, in substance (1) she pleaded guilty on August 4, 2005; (2) she was sentenced on September 27, 2010; and (3) "Over three years later, on February 21, 2014, without having sought any interim appeal of her

judgment the defendant filed the instant petition." Gov't's Mem. at 21. The government's opposition is wrong. The observation that there was no interim appeal from her judgment is surely gratuitous. Having pleaded guilty pursuant to a cooperation agreement and actively assisting the government in its ongoing investigation for five years, what would be the basis for an appeal? The five year hiatus between her plea on August 4, 2005 and her sentence on September 27, 2010 is, as the government surely knows, attributable to repeated requests for adjournment because of her continuing cooperation which required her testimony at the two trials of the securities fraud conspirators, the last of which concluded in April 2009. The belated disclosure of Brady material spawned motions for a new trial that were filed in October and November 2009, see 05-613, Dkt. Nos. 745 & 751, and decided by the District Court on July 21, 2010. Notices of Appeal were filed immediately thereafter, Dkt. No. 902, and the Court of Appeals decided the case on August 2, 2012, Mahaffy, 693 F.3d 113, and issued its Mandate on September 24, 2012, Dkt. Nos. 953–55. Dismissals of the superseding indictment and deferred prosecution agreements were not executed until late December 2013 and early January 2014. Dkt. Nos. 977–79. This coram nobis motion was filed February 2014, two months thereafter.

      Ms. Santiago's delay in seeking relief earlier is plainly attributable to the government's belatedly revealed failure to discharge its constitutional Brady obligations and the compelling circumstances to which it gave rise warranting the pursuit of this extraordinary remedy. The government's recognition of that truth is acknowledged in its ". . . even if Mahaffy gave rise to a valid cause to seek coram nobis relief, the petitioner waited approximately eighteen months before filing the instant petition after Mahaffy was decided." Gov't's Mem. at 23. But it wasn't the Mahaffy decision alone

15

which ignited the flames of injustice. It was "As a result of the <u>Mahaffy</u> decision . . . the securities fraud convictions of the squawk box defendants were vacated," the government candidly concedes, but adds by way of explanation, "For a host of reasons [not otherwise provided], including the fact that a third trial would be held more than ten years after the start of the investigation, five years after the first trial, and three years after the retrial, the government exercised its discretion and entered into deferred prosecution agreements with each of the squawk box defendants . . . ." Gov't's Mem. at 12.

Interestingly, the government "does not dispute that defense counsel has over the years, repeatedly implored the government to join in a request to vacate the conviction." Gov't's Mem. at 21 n.7. It was the eradication of the stain on the slate of the principal defendants that rankled and "gave cause" to the filing of the petition.

I find, for the reasons stated, that there were sound reasons for not seeking this appropriate relief sooner and that the second prerequisite for issuing this historic writ has been satisfied.

C. <u>Continues to Suffer Legal Consequences from Her Conviction</u>

The third prerequisite, that Ms. Santiago suffers legal consequences from her conviction that granting the writ would remedy, is also satisfied. She no longer has the securities license and the job in the securities industry she enjoyed for fifteen years as a consequence of her conviction. The government's reliance upon <u>Fleming</u>, 146 F.3d 88, in opposing her petition is also mystifying given its recitation of the holding in that case as follows: "The Second Circuit in <u>Fleming</u> concluded that without a prior history of work in the securities industry, a later desire to enter that industry was not sufficient for the purpose of coram nobis relief." Gov't's Mem. at 24. Reliance upon that case

16

following an acknowledgement that she lost her Series 7 license and her job at Merrill Lynch which she had for fifteen years because "she has failed to claim that she actually seeks to return to the securities industry" (emphasis theirs) is incomprehensible. It suggests that Ms. Santiago was required to submit a futile application for the restoration of her securities license notwithstanding 15 U.S.C. § 78o(b). Ms. Santiago "had a real future in the securities industry and she would leap at the opportunity to get back in. It is largely for that reason that she brings this Petition before the Court." Reply in Support of Petition for Writ of Error Coram Nobis, Dkt. No. 42, at 5. It is interesting to note that Fleming argued that his conviction "should be vacated because it was tainted by various alleged constitutional violations, including the withholding by the government of exculpatory evidence in violation of the rule of Brady v. Maryland . . . . " *Supra*, at 89.

In its opposition, the government writes that ". . . the petitioner argues that she endures continuing legal consequences in her ability to serve as a federal or Pennsylvania state juror, along with other diminished civil rights and reputational harms. As a preliminary matter, to meet the burden 'the mere desire to be rid of the stigma of a conviction is not enough.'" If it is correct to construe that response to the Petitioner's writ as a dismissal of those consequences of a conviction as irrelevancies, a cursory review of the relevant cases to the contrary is appropriate. In Morgan, *supra*, the Court concluded its opinion by observing that: "Subsequent convictions may carry heavier penalties, civil rights may be affected." 346 U.S. at 512–13 (citations omitted). In Carafas v. LaVallee, 391 U.S. 234, 237 (1968), the Court wrote: "It is clear that petitioner's cause is not moot. In consequence of his conviction, he cannot engage in certain businesses; . . . he cannot vote in any election held in New York State; he cannot

17

serve as a juror. Because of these disabilities or burdens [which] may flow from petitioner's conviction, he has a substantial stake in the judgment of conviction . . . ." (quotations and citations omitted); see also Dean v. United States, 436 F. Supp.2d 485, 489 (E.D.N.Y. 2006) ("It is clear . . . that Dean's conviction disqualifies him from a category of jobs, including the position he held for twelve years."); Carnesi v. United States, 933 F. Supp.2d 388, 394 (E.D.N.Y. 2013).

Justice Douglas captures the essence of the matter exquisitely in Fiswick v. United States, 329 U.S. 211, 222 (1946): "An outstanding judgment of conviction for this crime stands as ominous proof that [she] did what was charged and puts beyond [her] reach any showing of ameliorating circumstances or explanatory matter that might remove all or part of that curse . . . . [she] would . . . carry through life the disability of a felon; and by reason of that fact [she] might lose certain civil rights. Thus [she] has a substantial stake in the judgment of conviction." (citations omitted). That observation prompts to recall as particularly apt and thought provoking the reflection of the Court of Appeals in Mahaffy, *supra*, at 133–34, that "we have little confidence that the result would have been the same had the government complied with its Brady obligations and disclosed the SEC transcripts . . . Where, as here, 'the government suppressed evidence in its possession which was both exculpatory and impeaching, . . . there is a reasonable probability that if the evidence had been disclosed, the outcome of the proceeding would have been different.'" (citation omitted).

In the course of his address to the assembled United States Attorneys noted above, then Attorney General Jackson reminded his audience that "Although the government technically loses its case, it has really won if justice has been done."

For all of the foregoing reasons, this petition is granted and it is

SO ORDERED.

Dated: Brooklyn, New York
June 27, 2014

_____s/_____
I. Leo Glasser